JAMES A. GILLIES and Others, Plaintiffs, *v.* ORIENTA BEACH CLUB and Another, Defendants.*

Supreme Court, Special Term, Westchester County, November 25, 1935.

*Affd., 248 App. Div. 623.

*Curtis, Mallet-Prevost, Colt & Mosle* [*David A. Embury* of counsel], for the defendants, movants.

*Uniacke & Kelley* [*Joseph R. Kelley* of counsel], for the plaintiffs, in opposition.

BLEAKLEY, J.   Defendants move to dismiss the amended complaint upon the ground that it fails to state facts sufficient to constitute a cause of action.

The complaint seeks to enjoin the defendants from interfering with the use by the plaintiffs and others resident on Orienta Point of a certain parcel of beach property situated on Walton avenue in the village of Mamaroneck.

The plaintiffs allege that for more than fifty years by a custom and usage the inhabitants of Orienta Point have used and enjoyed the parcel of land in question for access to Long Island Sound, for beach bathing and boating purposes.

It is further alleged that by virtue thereof the plaintiffs are entitled to the enjoyment of a customary right in the nature of an easement.

The defendants in particularizing the motion to dismiss contend that in the State of New York no such right can be created; that the uses and purposes for which it is alleged the customary right exists exceed in scope the customary rights granted under the English law and that the complaint fails to allege that the custom has existed from time immemorial.

The first question for determination is whether a customary right in the nature of an easement exists in New York State.

It is well to point out that the easement claimed is not an appurtenant easement by express grant, implication, dedication or prescription.   It is not claimed that the easement is an easement in gross running to particular persons.

Plaintiffs assert that it is a right in the nature of an easement in favor of a class for the time being comprising the residents of a particular locality growing out of the customary use of the lands for a period of twenty years.

From England we derive many of our laws. It was in England that the doctrine of customary right in the nature of an easement originated.

" The Law of England, according to Lord COKE, forms a triangle: one side of which is the common law, extending to and over the whole Kingdom; another side is the statute law, enacted by Parliament for the government either of the whole community, or of such parts and portions of it as in their wisdom the exigencies of the nation require; and the third side is formed of the customs, repugnant to the common law and beyond it, and which are applicable to particular communities of individuals." (*Post* v. *Pearsall*, 22 Wend. 425, 440.)

The customary right in the nature of an easement is well explained in *Post* v. *Pearsall* (*supra*, p. 440): " A custom can only exist in favor of the community of a town, village or hamlet, &c. and must be pleaded; and because the claimants have been in the immemorial use of the right claimed, the legal presumption in England is, that those customs were originally based upon and created by act of Parliament; although not by that body as it is now constituted."

Blackstone says: " And, first, the distinction between custom and prescription is this: that custom is properly a *local* usage, and not annexed to any *person;* such as a custom in the manor of Dale that lands shall descend to the youngest son; prescription is merely a *personal* usage; as, that Sempronius, and his ancestors, or those whose estate he hath, have used time out of mind to have such an advantage or privilege. As for example; if there be a usage in the parish of Dale, that all the inhabitants of that parish may dance on a certain close, at all times, for their recreation; (which is held to be a lawful usage) that is strictly a custom, for it is applied to the *place* in general, and not to any particular *persons;* but if the tenant, who is seised of the manor of Dale in fee, alleges that he and his ancestors, or all those whose estate he hath in the said manor, have used time out of mind to have common of pasture in such a close, this is properly called a prescription; for this is a usage annexed to the person of the owner of this estate." (2 Bl. Com. 263, 264.)

Reeves in his Treatise on the Law of Real Property (pp. 219, 192, 219–220) makes the following reference:

" ' Custom is distinguished from prescription in that the former is a mere local usage, not annexed to any particular person, but belonging to the community rather than to its individuals, while the latter

is a personal usage or enjoyment confined to the claimant and his ancestors or those whose estate he has acquired.'" "Thus, a privilege for the inhabitants of a certain town or parish to dance and play games on a particular piece of land may grow out of a custom immemorially continued (*Fitch* v. *Rawling*, 2 H. Blackst. 393); but if the owner of a lot of land has a right of way over his neighbor's field because he, or he and his grantors, have walked across it for many years, he is the owner of an easement founded on prescription."

"Custom, moreover, is an outcome of immemorial usage, and will not ordinarily result from proof of twenty years of adverse enjoyment.

"There have been presented to the courts very few cases in which title to incorporeal hereditaments has been held to rest on custom alone. In the rare instances in which it has given rise to servitudes, it has been shown to have continued for time out of mind in favor of a practically definite class of families or persons constituting a town, village, or other community, and to have been reasonable in purpose and scope, so as not to preclude the ordinary use of the land by its owner. Thus, in *Fitch* v. *Rawling* it was held that a custom for the inhabitants of a certain parish to enter upon a designated piece of land, at reasonable times in each and every year, and play at cricket and other games was good, and could be established against the landowner by showing that they and their ancestors had enjoyed this privilege for time whereof the memory of man ran not to the contrary. But it was declared that it could not be claimed as a good custom for all the people of England to do this, nor in favor of strangers or other persons, not residents of the parish, who happened to be there at the times when the games were played. A custom for all the inhabitants of a town to go upon a certain *close* on a specified day in each year, for the purpose of horse-racing, was decided to be valid. (*Mounsey* v. *Ismay*, 3 H. & C. 486.) But the residents of a village could not thus obtain the right to go upon a piece of land, *at their pleasure*, to exercise horses (*Sowerby* v. *Coleman*, 2 Ex. 96, 99), or to play golf (*Dempster* v. *Cleghorn*, 2 Dow. 40, 49, 62), since this would be unreasonable; nor could they, in this way, gain the privilege of walking or riding over a field at times in the year when the owner had corn or other annual crops growing or standing thereon, because this would tend to destroy altogether the profits of his land. (*Bell* v. *Wardell*, Willes, 202.)"

19 C. J. 872, contains the following quotation: "Rights in the nature of easements may have their basis in local or particular custom; but rights arising by custom are not true easements.

Quasi easements founded on custom appertain to many as a class, and not as grantees, nor do such rights require the existence of a dominant tenement. Where, however, rights capable of being the subject of grant as true easements are claimed by custom as belonging to those entitled in respect of their estates, no essential of a true easement is lacking, except that the origin of the right is custom, and not grant or prescription. Rights of a character not allowable as easements may be claimed by custom, but a right in the nature of a profit *à prendre* cannot exist by custom."

The American and English Encyclopædia of Law (Vol. 29 [2d ed.], p. 369) says: " Particular Customs in England.— In England there are many particular customs which constitute the law for the localities in which they prevail. To be valid, such customs must be of immemorial antiquity; they must be certain, continued without interruption, compulsory, and acquiesced in; and they must not be unreasonable, or inconsistent with each other."

Ruling Case Law on Easements (9 R. C. L. 743) defines custom as follows: " 11. Custom.— At common law certain rights could be acquired by custom which, while in the nature of easements, must yet be distinguished from strict easements. * * * Such a right differs from an easement appurtenant, because to constitute an easement of that kind there must be two tenements, a dominant one to which the right belongs, and a servient one upon which the obligation is imposed; but in the case of a custom there is no dominant tenement. It differs from an easement in gross in that the latter is a burden upon the premises during the life of the owner of the easement only, while a right acquired by custom is not subject to such limitation."

In *Graham* v. *Walker* (78 Conn. 130; 61 A. 98) the court was called upon to decide whether a right of way by custom existed. In defining such a right of way it said:

" A right of way by custom in favor of the inhabitants of a particular locality might be set up by the common law of England. It could be proved by immemorial usage. From such proof a presumption was deemed to arise that the usage was founded on a legal right. This right was not assumed to arise from a grant by an owner of land of an easement in it. No grant of that nature can subject the tenement of the grantor to an easement which will outlast the life of the grantee, unless it be made in such a way as to become appurtenant to some other tenement. A right of way by custom appertains to a certain district of territory, but not to any particular tenement forming part of that territory. Nor is it confined to owners of land within that territory. It belongs to the inhabitants of that territory, whether landowners or not. To a fluctuating

body of that kind no estate in lands can be granted. If therefore an easement be claimed to exist in their favor, a title cannot be made out by prescription, on the theory of a lost grant. It must have come, if at all, from some public act of a governmental nature.

" The theory of English law was that, if there had been a usage from time immemorial (that is, so far as could be ascertained, from the coronation of Richard I.), affecting the use of real estate by those not able to show any paper title to warrant it, it might fairly be presumed that it arose under an Act of Parliament or other public act of governing power, the best evidence of which had perished. A charter from some feudal lord or ecclesiastical corporation might be such an act. Of such charters there were no public records. That the accidental destruction of the parchment on which one was written should annul the privileges which it gave would be plainly unjust."

It is admitted that the courts of this State have not directly passed upon the question and it, therefore, becomes the duty of this court to decide whether the law of England with reference to custom has become a part of the law of this State.

An examination of the texts and authorities elsewhere is of service. Reeves, in his Treatise on the Law of Real Property (*supra*), says: " In a country like this, where towns and villages are newer and change more rapidly than in England, while the theory of the creation of servitudes by custom may prevail, yet the circumstances which give rise to the above-enumerated requisites rarely occur; and in many of the United States such rights have never been held to have been called into existence." (P. 220.)

The American and English Encyclopædia of Law (*supra*) says: " These customs are of no practical importance in America, since they cannot here have the immemorial antiquity which is requisite to their validity." (P. 371.)

Ruling Case Law on Easements (*supra*) emphatically states: " *In this country a personal right of way or other easement resting on local custom is not recognized, for the reason that the rules of the English common law which gave them sanction are not adapted to the conditions of* political society here existing." (Italics mine.)

In *Post* v. *Pearsall* (*supra*) it was conceded (although not necessary to the decision) that the law of customs was never adopted in this State.

In *Graham* v. *Walker* (*supra*) the court refused to adopt the law of custom and most cogently stated its reason therefor. It said: " The political and legal institutions of Connecticut have, from the first, differed in essential particulars from those of England. Feudalism never existed here. There were no manors or manorial

rights. A recording system was early set up and has been consistently maintained, calculated to put on paper, for perpetual preservation and public knowledge, the sources of all titles to or incumbrances affecting real estate. Nor have we all the political subdivisions of lands which are found in England. An easement by custom may exist there in favor of the inhabitants of a city, county, town, hamlet, burgh, vill, manor, honour, or hundred. 1 Coke Lit., 110-b, 113-b, 115-b. Most of these terms denote forms of communities that are unknown in this State. Under our statute of limitations, also, rights of way may be established by a shorter user than that required by the English law. *Coe* v. *Wolcottville Mfg. Co.*, 35 Conn. 175; General Statutes, § 1073.

" During the greater part of the colonial era, the common law of England was not deemed to form a part of the jurisprudence of Connecticut, except so far as any part of it might have been accepted and introduced by her own authority. Stat., Ed. 1769, 1; 1 Swift's System, 44. Later the doctrine received the sanction of this court that it was brought here by the first settlers, and became the common law of Connecticut so far as it was not unadapted to the local circumstances of this country. *Card* v. *Grinman*, 5 Conn. 164, 168. This court has never affirmed the recognition by our law of personal rights of way or other easements resting on local custom. In view of all the considerations named, we are of opinion that such rules of the English common law as gave them sanction were unadapted to the conditions of political society existing here, and have never been in force in Connecticut. It follows that the trial court erred in directing the jury to disregard the second defense."

In *Knowles* v. *Dow* (22 N. H. 387) a contrary view is taken but the opinion is not as well considered. It follows strictly the English precedents without considering the adaptability of the principle to changed conditions.

A careful reading of the English authorities convinces one that the custom had its origin in the fact that from time immemorial the use had been permitted; that because of the length of time the use had existed any records of statutes creating the right had been destroyed; a presumption that the use had been duly authorized was, therefore, created.

The necessity for such a fiction does not exist in this State. England is of the Old World, our State is of the New. Its statutes have not been lost or destroyed. Its recording acts have been in existence since early in its history.

The complaint alleges that the easement has been in use for fifty years. Such an allegation in England would not have justified invoking the law of custom for in its history fifty years is but a short period and such a use would not be considered as time immemorial.

I can find no language more expressive of the harm that would result from adopting the English law of custom than is contained in the opinion of Judge COWEN in *Pearsall* v. *Post* (20 Wend. 111, at p. 135). He says: " I will merely add, upon the main question, that considering our extensive lines of coast, immense, when we take into the account our seas, lakes and rivers; the long public enjoyment throughout, of landings on mere courtesy, and under the notion, I am persuaded, of mere license revocable when the resort should become inconvenient; considering the like circumstances in respect to other objects, such as watering places at the shore and in creeks, springs and wells; a rule of law, which should admit the possibility of turning such enjoyment into prescriptive and absolute right on the part of the public, would open a field of litigation, which no community could endure. What is still worse in a moral point of view, it would be perverting neighborhood forbearance and good nature, to the destruction of important rights."

Motion to dismiss complaint granted.